UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Crim. No. 15-cr-198-GZS |
| | ) |
| SAL MANSY | ) |
| TV TOYZ | ) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT ONE OF THE INDICTMENT**

NOW COMES the United States of America, by and through its attorneys Thomas E. Delahanty II, United States Attorney for the District of Maine, and Michael J. Conley, Assistant United States Attorney, and respectfully seeks the denial of defendants' Motion to Dismiss the Indictment (Docket Item # 35).

**PRELIMINARY STATEMENT**

The charge in Count One of the Indictment is straightforward: defendant Sal Mansy ran a business (co-defendant TV Toyz) that aided and abetted Mansy's buying and selling of the virtual currency Bitcoin for profit. Mansy operated his business without ever registering it with federal authorities and with full awareness that he was required to do so. Through this failure to register, Mansy violated Title 18, United States Code, Section 1960, which makes it a crime to transfer money for others as a business without obtaining appropriate licenses.

Defendants move to dismiss Count One on the grounds that the statute is flawed and that the money Mansy moved for his customers took the form of Bitcoins. Neither position has any support in the statutory text, legislative history, or relevant case law. Section 1960 is an anti-money laundering statute intended to impede money transmitters of all stripes from, among other things, moving money in an unlicensed fashion. The statute thus broadly applies to any business

1

engaged in "transferring funds" on behalf of its customers – "by any and all means." As courts have held, virtual currencies such as Bitcoin easily qualify as "funds," as they are a digital substitute for cash that can be used to conduct monetary transactions online – as the very term "virtual currency" implies.  In short, Mansy's conduct unambiguously falls within both the letter and spirit of the statute.  Accordingly, his motion seeking dismissal of the indictment should be denied.

**FACTUAL BACKGROUND**[1]

    A.    <u>Bitcoins and Bitcoin Exchangers</u>

Bitcoins are a form of virtual currency, existing entirely on the Internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a decentralized, "peer-to-peer" network.

Bitcoins are stored on the Bitcoin network in what are called Bitcoin "addresses." A Bitcoin address is analogous to a bank account number, designated by a complex string of letters and numbers. Each Bitcoin address is controlled through the use of a unique, corresponding "private key" – a kind of cryptographic password needed to access the address. Only a holder of the "private key" for an address can authorize any transfers of Bitcoins from that address to other Bitcoin addresses.  No identifying information about the payor or payee is transmitted in a

---

[1] The following background is based on the facts set forth in the affidavit submitted in support of the search warrant for the defendant's Yahoo.com email account (15-mj-91-JHR) as well as additional facts that the Government intends to prove should the case to proceed to trial. These facts do not constitute a full proffer of the Government's evidence but are offered only to provide context to the allegations of the Indictment.

2

Bitcoin transaction. Only the Bitcoin addresses of the parties are needed for the transaction, which by themselves do not reflect any identifying information.

To acquire Bitcoins, a user typically must purchase them from a Bitcoin "exchanger." Bitcoin exchangers generally accept payments of conventional currency and, in return for a commission, transfer a corresponding number of Bitcoins, based on a floating exchange rate, to a Bitcoin address designated by the customer. Bitcoin exchangers doing business in the United States are considered money transmitters under federal anti-money laundering ("AML") regulations and are required to register with the Financial Crimes Enforcement Network ("FinCEN"). See 31 C.F.R. § 1010.100(ff)(5); see also FinCEN, Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, March 18, 2013, FIN-2013-G001, at 4-5, available at https://www.fincen.gov/statutes_regs/guidance/html/FIN-2013-G001.html ("FinCEN Guidance") (Attached as Ex. A).

B.      Undercover Purchases of Bitcoin from Mansy

Beginning in early December 2014, agents identified an individual advertising Bitcoin transactions online using the moniker 'TVTOYZ.COM.' At this time, 'TVTOYZ.COM' was listed on the 'www.localbitcoins.com' website as one of the largest volume sellers on the website; 'TVTOYZ.COM' advertised nationally that s/he accepted cash deposits into his/her bank accounts, in addition to other methods, in exchange for Bitcoin. According to 'www.localbitcoins.com,' 'TVTOYZ.COM' had created his/her account in approximately September 2013, had engaged in his/her first 'transaction' in approximately May 2014, and had engaged in over 3,000 transactions in this period with more than 1,740 individuals.

Agents determined that 'TVTOYZ.COM' was an entity (and an actual website) owned, operated, and registered as a Limited Liability Corporation with the state of Michigan by Sal Mansy.   A search of the FinCEN online money services business registrant database revealed no entity by the name 'TVTOYZ.COM' or any similar name registered as a money services business; Mansy himself was also not reflected as an individual registrant within the database.

In December 2014, agents observed that 'TVTOYZ.COM' was advertising nationally on the 'www.localbitcoins.com' website that he accepted deposits through Moneygram, 'Cash Deposit at your local Walmart, CVS, Rite Aid, Party store,' 'Vanilla' pre-paid cards, and 'Reloadit' pre-paid cards in exchange for Bitcoin. Each method of payment featured a different purchase price for Bitcoin, with the Moneygram, Vanilla, and Reloadit methods listed as the most expensive. According to his profile, upon initiation of a trade, Mansy would place a buyer's requested Bitcoin trade amount in escrow, wait for confirmation from the buyer that the cash deposit had been made into his designated account or that the pre-paid card had been purchased and loaded, and would then release the Bitcoin to the buyer's e-wallet within 180 minutes.

On December 22, 2014, agents initiated a 'trade' with Mansy through one of his 'www.localbitcoins.com' advertisements, and successfully purchased 1.3296 Bitcoin from him by paying $500 cash into an account specified by Mansy through a Moneygram outlet in Scarborough, Maine. At the time of this purchase, Mansy was selling Bitcoin for $376.06 U.S. dollars per one Bitcoin, whereas the prevailing trade rate for Bitcoin at that specific time was approximately $331.58 U.S. dollars per one Bitcoin.

On March 2, 2015, agents initiated a second 'trade' with Mansy, again through one of his 'www.localbitcoins.com' advertisements, and purchased 5.002 Bitcoin from him for $1,500

4

cash. As with the December trade, agents sent the cash through the same Moneygram outlet in Scarborough, Maine to an account Mansy specified. At the time of the purchase, Mansy was selling Bitcoin for $299.88 U.S. Dollars per one Bitcoin, whereas the prevailing trade rate for Bitcoin at that specific time was $266.67 U.S. Dollars per one Bitcoin.

    C.    <u>Coinbase</u>

On April 2, 2015, agents sought information from Coinbase, a Bitcoin wallet and exchange service headquartered in San Francisco, California. Coinbase reported that Mansy had been a customer from August 9, 2013 through June 18, 2014. While he was a customer, Mansy had listed his contact email of salmansy@yahoo.com. During the nine months that his account was active, Coinbase reported that Mansy had purchased approximately $577,000 in Bitcoin from the company.

On June 18, 2014, Coinbase banned Mansy's account because it suspected that he was operating an unlicensed money service business and selling the Bitcoin he was purchasing from the company on other websites. Coinbase also disclosed all email correspondence between the company and Mansy during the period his account was open. Within the correspondence, agents encountered a string of emails between Coinbase and Mansy dated June 17 and June 18, 2014. In the first email of the string, Coinbase notified Mansy that it had noticed a high volume of transactions from him and needed to collect more information regarding his activity; namely, whether he was selling and/or buying Bitcoin for non-Coinbase customers and, if so, whether he was registered with FinCEN as a money service business. In response, Mansy stated, "yes I buy [Bitcoin] and sell them on localbitcoin.com, ebay, and blogs the funding source is my business bank account."

In response, Coinbase informed Mansy that "…selling Bitcoin on a website like localbitcoins.com places you in the category of a [money service business] according to FinCEN," and that because this activity violated Coinbase's terms of use, Mansy's account was being banned. Minutes later, Mansy responded"

> Please tell me you're kidding now what the hell do you care what I do with my Bitcoins after I buy from you. If you don't want me to buy from you it's your lost <sic> there's many many places I can buy them from by the way your services too expensive and too slow. . . . The IRS put bitcoin as a property category so according to the IRS it's property it's not currency so what the hell do you care or the government care what do I do with my property if I want to sell it or burn it. . . there are hundreds of sellers on localbitcoins.com so all of them are MSB ????? I don't think any of them is an MSB.

In response, Coinbase again stated on June 18, 2014 that he needed to register as a money service business with FinCEN in order to continue doing business with the company, and went on to explain in detail the steps Mansy would need to take to become compliant. Minutes after receiving this email, Mansy responded,

> But I not an MSB I only so <sic> bitcoins I buy them from you or somebody else and resell them like product. I can't afford to hire an officer and do all that I don't make that much money off this business. I do claim all the profit on my taxes of my business as a business income.

On June 20, 2014, after closing his account, Coinbase responded a final time, stating that it believed Mansy was describing himself as an unlicensed money service business, and that "[t]he only way we can accept accounts like yours is if they are in compliance." Many months later, on January 7, 2015, Mansy sent a final email, stating, "John I need to buy bitcoins bad. I need you to turn my account back on."

6

## LEGAL STANDARD

"A defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged." United States v. Post, 950 F. Supp. 2d 519, 527 (S.D.N.Y. 2013) (internal quotation marks and citations omitted) (citing Fed. R. Crim. P. 7(c)(1)). "An indictment must be read to include facts which are necessarily implied by the specific allegations made." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992). It "does not have to specify evidence or details of how the offense was committed." United States v. Coffey, 361 F. Supp. 2d 102, 111 (E.D.N.Y. 2005). At least one circuit has "consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (citing United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975)).

Federal criminal procedure does not provide for pretrial determination of the sufficiency of the evidence. "[T]here is no summary judgment in criminal cases." United States v. Elie, No. S3 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012). Thus, in the absence of a full proffer of the government's evidence, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998). Instead, the Court is limited to determining whether the allegations of the indictment, taken as true and including all facts necessarily implied, are sufficient to establish a violation of the charged offense. United States v. Sampson, 371 U.S. 75, 78-79 (1962). Accordingly, to the extent the defendants' motion could be construed to raise factual issues

concerning whether the Government will be able to prove all the elements of the offense at trial, those issues are not appropriately addressed here. See Fed. R. Crim. P. 12(b) (providing that a motion to dismiss may raise "any defense, objection, or request that the court can determine without a trial of the general issue").

## ARGUMENT

### The Indictment Properly Alleges that the Defendants Operated an Unlicensed Money Transmitting Business

A.  Applicable Law

Title 18, United States Code, Section 1960, makes it a crime to operate an "unlicensed money transmitting business." 18 U.S.C. § 1960(a).   The term "money transmitting" is defined in the statute as "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."   Id. § 1960(b)(2).

The statute sets forth three circumstances under which a business constitutes an "unlicensed money transmitting businesses" within the scope of its prohibition. Section 1960(b)(1)(A) makes it a crime to operate a money transmitting business without an appropriate state license where one is required. Section 1960(b)(1)(B) makes it a crime to operate a money transmitting business without registering with federal authorities (i.e., FinCEN) if required by federal regulation. And Section 1960(b)(1)(C) makes it a crime to operate a money transmitting business – whether licensed by any authority or not – that "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." Defendants are

charged with violating the second provision of the statute – i.e. operating a money transmitting business that was not registered with FinCEN.

  B. Discussion

    1. Bitcoins Are the Digital Equivalent of Cash and Readily Qualify as "Funds"

  Defendants' primary argument is that those immersed in the realm of virtual currency (e.g. Bitcoin) fall outside the scope of Section 1960. This argument must fail. As reflected by the statute's plain language, its legislative history, and case law precisely on point, Section 1960 applies to transmitters not just of real currency, but of any type of "funds" – a term that easily encompasses virtual currencies such as Bitcoin.

  As noted, Section 1960 broadly defines "money transmitting" to include "transferring funds on behalf of the public by any and all means." 18 U.S.C. § 1960(b)(2). As the statute does not specifically define the term "funds," the term is given its ordinary meaning. See Taniguchi v. Kan Pacific Saipan, Ltd., 132 S.Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). The term "funds" is a flexible one, encompassing any liquid form of value that can substitute for cash. Black's Law Dictionary, for example, defines "fund" as "a sum of money or other liquid assets established for a specific purpose." Black's Law Dictionary 743 (9th ed. 2009). A "liquid asset" is defined by cross-reference to "current asset," id. at 1014, which means "[a]n asset that is readily convertible into cash," id. at 134. Other, non-legal dictionaries define the term "funds" in a similarly open-ended fashion. The Oxford English Dictionary, for example, defines "funds" as "money at a person's disposal; pecuniary resources." Oxford English Dictionary (2d ed. 1989). The term "pecuniary" is defined in turn as "of or relating to money; monetary; financial." Id.; see also

Random House Dictionary (4th ed. 2001) (defining "funds" as "money immediately available; pecuniary resources").

Bitcoin neatly fits such description. Bitcoin was specifically designed to serve as the digital equivalent of cash. See Satoshi Nakamoto, Bitcoin: A Peer-to-Peer Electronic Cash System, available at https://bitcoin.org/bitcoin.pdf (original concept paper by Bitcoin's creator). And it is in fact so used. Unlike "property" (Defendants' Brief at 1 and 15), Bitcoin can easily be purchased in exchange for ordinary currency and used to conduct financial transactions.  See SEC v. Shavers, 13 Civ. 416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) ("It is clear that Bitcoin can be used as money.  It can be used to purchase goods or services, and . . . used to pay for individual living expenses. . . . [I]t can also be exchanged for conventional currencies."). That Bitcoin qualifies as "funds" was made equally clear in United States v. Ulbricht, 2014 WL 3362059, at *24 (S.D.N.Y. Jul. 9, 2014). In that case, the defendant was charged with, among other things, money laundering conspiracy, and moved to dismiss that charge based on the argument, similar to the one defendants' advance here, that the term "funds" as used in the money laundering statute only encompasses real currency. Rejecting the argument, the Court explained:

> Put simply, "funds" can be used to pay for things in the colloquial sense. Bitcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things. Indeed, the only value for Bitcoin lies in its ability to pay for things—it is digital and has no earthly form; it cannot be put on a shelf and looked at or collected in a nice display case. . . . Sellers using Silk Road are not alleged to have given their narcotics and malicious software away for free—they are alleged to have sold them.

2014 WL 3362059, at *24 (S.D.N.Y. Jul. 9, 2014).

This holding is not a novel one. The term "funds" has previously been construed to

10

encompass virtual currency, specifically in the context of Section 1960. See United States v. E-Gold, Ltd., 550 F. Supp. 2d 82 (D.D.C. 2008). In E-Gold, the defendants were charged with violating Section 1960 based on their operation of a virtual currency service that functioned as an "alternative payment system over the Internet." Id. at 85 (internal quotation marks omitted). The defendants sought to dismiss the charge, based on the argument that Section 1960 only reaches those who "deal in cash or currency." Id. at 82. Rejecting the argument, the E-Gold court found that it was "clear" that the text of the statute reached virtual currency, as the statute "defines 'money transmitting' broadly to include transferring 'funds,' not just currency, by 'any and all means;' it is not limited to cash transactions." Id. at 88.

What is more, to ascertain what Congress meant by "money transmitting" as used in Section 1960 is not a head-scratching exercise. The statute includes its own definition of the term, and it speaks of transferring not "cash" or "currency," but "funds." Had Congress intended the statute to have a narrower reach, it would have used narrower language.

Not only is defendants' construction of Section 1960 precluded by the statute's text, it is also inconsistent with its legislative history. Section 1960 was passed as an anti-money laundering statute, "designed, inter alia, to prevent the movement of funds in connection with drug dealing." United States v. Bah, 574 F.3d 106, 112 (2d Cir. 2009) (citing H.R. Rep. No. 107-250(I), at 54 (2001)). As explained in the Senate report accompanying the original legislation, Congress was concerned that drug dealers were turning increasingly to "nonbank financial institutions" to "convert street currency into monetary instruments" in order to transmit the proceeds of their drug sales. S. Rep. 101-460, 1990 WL 201710 (1990) (discussion of Title II). Section 1960 was intended to address this "gaping hole in the money

11

laundering deterrence effort." Id.

Defendants' cramped reading of the statute would fail to effectuate its broad law enforcement purpose. Today, virtual currency exchangers are among the "nonbank financial institutions" that pose significant money laundering risks. Congress designed the statute to keep pace with such evolving threats – which is why it cast a wide net and drafted the statute to apply to any business involved in transferring "funds . . . by any and all means." While defendants note that "[Section 1960] fails to provide any guidance on . . . virtual currency" (Defendants' Motion to Dismiss at 16), Congress sought to address a general problem susceptible to many variations. It therefore used flexible language, capable of being adapted to ever-changing methods of moving money. "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth." Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212 (1998) (internal quotation marks omitted); see also Barr v. United States, 324 U.S. 83, 90 (1945) ("[I]f Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators.").[2]

---

[2] Defendants make repeated references to IRS guidance to support the proposition that Bitcoin qualifies as 'property' and not 'money.'  Defendants' Motion to Dismiss at 1-2 and 15.  While no direct citations are provided, the Government understands that the agency guidance Defendants refer to for this proposition is FinCEN Guidance, supra, and IRS Notice 2014-21, available at http://www.irs.gov/pub/irs-drop/n-14-21.pdf ("IRS Guidance")).  These memos in no way conflict with the application of Section 1960 to Bitcoin exchangers. The FinCEN Guidance clarifies the applicability of FinCEN regulations to virtual currency administrators and exchangers. As background, it notes that virtual currency is not the same as real currency, but it does not suggest that virtual currency administrators and exchangers are exempt from regulation on that basis. To the contrary, it advises that such entities are considered "money transmitters" under FinCEN regulations, as noted further below.  See FinCEN Guidance at 1.  Indeed, the FinCEN Guidance expressly provides that "[t]he definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies."  FinCEN Guidance at

2. <u>The Application of Section 1960 to a Bitcoin Exchanger Does Not Violate the Rule of Lenity or the Due Process Clause</u>[3]

Lacking any support in the statutory text or legislative history, defendants appeal to constitutional principles. In particular, defendants argue that applying Section 1960 to a Bitcoin exchange business would run afoul of the rule of lenity and would constitute such a novel and unanticipated construction of the statute as to operate in a manner which would be in violation of the Due Process Clause. The same arguments were raised in the <u>E-Gold</u> litigation, where they were rightly dismissed, <u>see</u> <u>E-Gold</u>, 550 F. Supp. 2d at 100-101, as they should be here.

"The rule of lenity serves to aid the court in interpreting a criminal statute only if there is ambiguity." <u>See</u> <u>United States v. Litchfield</u>, 986 F.2d 21 (2d Cir. 1993). The Supreme Court has repeatedly admonished that the rule of lenity is "reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute." <u>Moskal v. United States</u>, 498 U.S. 103, 108 (1990) (quoting <u>Bifulco v. United States</u>, 447 U.S. 381, 387 (1980) (emphasis in original)); <u>see</u> also <u>Reno v. Koray</u>, 515 U.S. 50, 65 (1995) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." (internal citations and quotation marks omitted)). "The doctrine is thus one of last resort," <u>United States v. Venturella</u>, 391 F.3d 120, 133 (2d Cir. 2004) (citation and

---

3. As for the IRS Guidance, it addresses "only the U.S. federal tax consequences" of virtual currency transactions, advising in part that they are not treated the same as foreign currency transactions. The IRS Guidance is entirely irrelevant to Section 1960 or to anti-money laundering laws generally.

3 While not directly referenced, many of Defendants' arguments appear to invoke the Rule of Lenity (e.g. arguing that ambiguities in Section 1960 are unfair and should be resolved in favor of the Defendant). Accordingly, the Government addresses that here.

13

internal quotation marks omitted), and does not apply "merely because it [is] possible to articulate a construction more narrow than that urged by the Government." Moskal, 498 U.S. at 108.

There is no irreconcilable ambiguity requiring resort to the rule of lenity here. "The words of the statute are clear; the applicable rules of statutory interpretation are clear; and the legislative history is clear. A business is a money transmitting business if it transfers funds on behalf of the public by any and all means." E-Gold, 550 F. Supp. 2d at 100. Defendants' conduct falls comfortably within these broad terms and directly implicates the legislative motivation underlying the statute. The rule of lenity does not supply a basis for defendants to graft a narrowing construction onto the statute at odds with its ordinary meaning and manifest purpose. See id. ("That it may be 'possible to read the statute' differently is not reason enough to bestow upon the Court carte blanche to disregard the plain meaning of the statute and the obvious intent of Congress in favor of an interpretation that Congress never intended and that the words could scarcely suggest." (quoting Moskal, 498 U.S. at 107)).

Even less apposite is defendants' invocation of due process principles.  A straightforward application of the statutory language has already been found to apply in the virtual currency context.  See E-Gold, 550 F. Supp. 2d at 101 ("The Court imposes no novel construction upon defendants. Rather, it is Defendants' own novel construction of Section 1960 . . . that created the purported ambiguity giving rise to their motion to dismiss."). Indeed, Section 1960 has been applied to a variety of other fact patterns as well.  See, e.g., United States v. Ali, 515 F. 3d 100 (2nd Cir. 2008) (applying statute to hawala); United States v. Mazza-Alaluf, 607 F. Supp. 2d 484 (S.D.N.Y. 2009) (applying statute to business that moved

funds through variety of bank transactions).

Defendants' due process claim is particularly unconvincing given that the Government's evidence includes numerous discussions between Mansy and Coinbase in which Coinbase informed Masnsy of his requirement to register with FinCEN because he was operating as an unlicensed money service business. Defendants are thus in no position, now that they have been caught, to claim surprise that they are being criminally prosecuted for their conduct. See United States v. Pfeiffer, 371 F.3d 430, 437 (8th Cir. 2004) (rejecting defendant's due process challenge to alleged vagueness of criminal statute, based in part on clear evidence in the record that defendant had "actual notice" that the statute covered his conduct).

Finally, defendants attempt to undercut Section 1960 on due process grounds alleging that the statute "fails to identify with the requisite specificity what constitutes a culpable state of mind." Defense Motion to Dismiss at 1. In support of this argument, defendants make reference to the dissenting opinion in United States v. Talebnejad, 460 F.3d 563 (2006). The most effective path to address this argument is simply to cite to the majority:

> Section 1960, as currently written, applies to whoever knowingly conducts . . . an unlicensed money transmitting business," 18 U.S.C.A. § 1960(a), and defines "unlicensed money transmitting business," in relevant part, as "a money transmitting business which affects interstate or foreign commerce . . . and . . . fails to comply with the money transmitting business registration requirements" set forth in 31 U.S.C.A. § 5330 or accompanying regulations, 18 U.S.C.A. § 1960(b)(1)(B). There is no question here that the Government must prove the Talebnejads' knowledge as to all of the factual elements of the crime: that they were conducting a money transmitting business that affected interstate commerce and that was unregistered. **Therefore, § 1960(b)(1)(B) sets forth a constitutionally valid general intent crime, just as § 1960(b)(1)(A) does**. Nothing in the statutory language--such as the use of the word "willful"--suggests that the Government must additionally prove knowledge of the law. Further, it is not relevant that Congress made no change to § 1960(b)(1)(B) when it amended § 1960(b)(1)(A); there has never been a question as to whether a conviction under § 1960(b)(1)(B) required proof of the defendant's knowledge of the law.

Talebnejad, 460 F.3d at 24 (emphasis added).

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the defendants' motion to dismiss the indictment be denied.

Dated at Portland, Maine, this 21st day of June 2016.

Respectfully submitted,

Thomas E. Delahanty II
United States Attorney

/s/Michael J. Conley
Assistant United States Attorney
United States Attorney's Office
100 Middle Street, PO Box 9718
Portland, Maine 04101
(207) 780-3257
michael.conley@usdoj.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

**CERTIFICATE OF SERVICE**

  I hereby certify that on June 21, 2016, I electronically filed Government's Objection to Defendant's Motion to Suppress Evidence and Incorporated Memorandum with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

  Luke Rioux
  Farris Frank Haddad
  Shawn P. Smith

        Thomas E. Delahanty II
        United States Attorney


        /s/Michael J. Conley
        Assistant United States Attorney
        United States Attorney's Office
        100 Middle Street, PO Box 9718
        Portland, Maine 04101
        (207) 780-3257
        michael.conley@usdoj.gov