UNITED STATES DISTRICT COURT
DISTRICT OF MAINE


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:15-CR-198-GZS |
| | ) | |
| Sal Mansy, | ) | |
| TV Toys, LLC | ) | |

**DEFENDANTS' REPLY TO GOVERNMENT OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

The Defendants, though undersigned counsel replies to the Government's Opposition to the Defendants' Motion to Dismiss.  In support of this motion, the Defendants state as follows:

In its Opposition to Defendants' Motion to Dismiss, the Government struggles to define Bitcoin.  The Government concedes that Bitcoin cannot be defined as "money" or "currency" in the traditional sense.  It is also clear that Bitcoin is not specifically identified, named, or mentioned in Title 31, United States Code, section 5330, and the regulations prescribed thereunder, including Title 31, Code of Federal Regulations, Section 1010.100 (ff)(5), in violation of Title 18, United States Code, Sections 1960 and 2.  A monumental exercise is required by both parties and the Court to define Bitcoin and find a way to apply the above-listed statutes.  Depending on the perspective utilized in defining Bitcoin, the applicable statutes and regulations may, or may not, apply.   Surely the Courts must defer to the accused, and dismiss the Indictment, since there are so many variables that can determine whether or not the Defendants' failure to register was actually a criminal act.

As previously discussed, "Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words . . . . Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in

different contexts, sometimes mean different things." *Petix* at 8, citing, *Yates v. United States*, 135 S. Ct. 1074, 1081–82 (2015) (citations omitted).  Taking the two undefined terms in Section 1960 in reverse order, the Supreme Court already has applied the above principles of interpretation to the term "funds." "The ordinary meaning of 'fund[s]' is 'sum[s] of money . . . set aside for a specific purpose.'" *Petix* at 8, citing *Clark v. Rameker*, ___ U.S. ___, 134 S. Ct. 2242, 2246 (2014) (ellipsis and brackets in original) (citation omitted).

The Supreme Court happened to look at a dictionary to define "funds" in *Clark*, but consistent with the principle expressed in *Yates*, that definition aligns with how ordinary people would understand that term.  *Petix* at 8.  The Supreme Court's understanding of "funds" also is consistent with legislative materials that use the term in similar or analogous contexts. *Petix* at 8. For example, when the House of Representatives prepared a report for the proposed Financial Anti-Terrorism Act of 2001, it discussed "funds" that supported terrorism using examples such as cash, checks, credit cards, and "seed money." *Petix* at 8, citing, H.R. Rep. 107-250(I), 2001 WL 1249988, at *34 (2001). The civil forfeiture statute, 18 U.S.C. § 981, treats the term "funds" as something that, *inter alia*, can be deposited in established and regulated financial institutions. Some of the banking statutes use the term "funds" to describe something that can be deposited into and withdrawn from the United States Treasury. *Petix* at 8, *e.g.*, 12 U.S.C. § 1735.  From one source to another, the exact meaning of "funds" might change a little, but the uses of the term in the United States Code and in everyday life have in common the description that the Supreme Court used: designated or allocated sums of money. *Petix* at 9.

The Supreme Court years ago expressed the ordinary understanding of money as a regulated instrument when, quoting Blackstone, it wrote that "[t]he coining of money is the act of the sovereign power, *that its value may be known on inspection*." *Petix* at 10, citing, *Legal*

2

*Tender Cases*, 79 U.S. 457, 491 (1870) (emphasis in original), *abrogated in part on other grounds by Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 326 n.21 (2002).  The Ninth Circuit once wrote a succinct yet fairly comprehensive description of how money draws its usefulness from governmental authority:

> The broad and comprehensive national authority over the subjects of revenue, finance and currency is derived from the aggregate of the powers granted to the Congress, embracing the powers to lay and collect taxes, to borrow money, to regulate commerce with foreign nations and among the several states, to coin money, regulate the value thereof, and of foreign coin, and fix the standards of weights and measures, and the added express power to make all laws which shall be necessary and proper for carrying into execution the other enumerated powers. The constitution was designed to provide the same currency, having a uniform legal value in all the States. It was for that reason that the power to regulate the value of money was conferred upon the federal government, while the same power, as well as the power to emit bills of credit, was withdrawn from the states. The states cannot declare what shall be money, or regulate its value. Whatever power there is over the currency is vested in the Congress. The power includes [t]he authority to impose requirements of uniformity and parity (which) is an essential feature of this control of the currency. The Congress is authorized to provide a sound and uniform currency for the country, and to secure the benefit of it to the people by appropriate legislation. *Petix* at 10, citing, *Laycock v. Kenney*, 270 F.2d 580, 590 (9th Cir. 1959) (internal quotation marks and citations omitted).

Criminal monetary statutes exist in part to protect a uniform, regulated monetary system; that is, they aim to prevent any implicit lending of sovereign power or legitimacy to criminal enterprises. *Petix* at 11, citing, *Cf., e.g., United States v. Fernando*, 745 F.2d 1328, 1330 (10th Cir. 1984) ("Thus, it may be fair to assume that Congress, perceiving the possibility that misuse of currency could occur more easily, intended the scope of § 649 to be restricted to currency only and not to include negotiable documents. Finally, the existence of other criminal statutes, such as 18 U.S.C. § 641, which has a scope clearly broad enough to make criminal any conversion to personal use of checks as well as money, persuades us that a broad reading of the term 'money' is not imperative."); Lawrence Trautman, *Virtual Currencies; Bitcoin & What Now After Liberty*

*Reserve, Silk Road, and Mt. Gox?*, 20 Rich. J.L. & Tech. 13 (2014) (noting that part of the mission of the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") "is to safeguard the financial system from illicit use"); Oedel, 46 Am. U. L. Rev. at 1084 ("In its traditional forms, money gives to its users the chance to buy or sell valuables more quickly and more anonymously than in a barter economy. This feature may be useful not only to legitimate businesspersons seeking to streamline commerce, but also to parties hoping to hide illegal transactions, illicit sources of funding, and taxable income from public scrutiny. To prevent the use of money for such fraudulent purposes, governments sometimes oblige financial institutions to report unusual cash transactions and to disclose monetary flows that appear to be linked to fraudulent activities.") (citations omitted). *Petix* at 11.

In this case, the Government's theory of prosecution requires treating Bitcoin as money in the ordinary understanding of that term.  Because Bitcoin does not fit an ordinary understanding of the term "money," the Defendants cannot have violated Section 1960 in its current form. As a matter of law, then, Count One fails no matter what amount of factual evidence the Government might have at its disposal.

The principal authorities that the Government has cited do not change the above analysis. *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008), did not attempt to define the terms money" or "funds," and neither did the FinCEN regulations cited in the Government's papers. *Petix* at 14.  In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014)—*a.k.a.* the "Silk Road case"—the court turned directly to a dictionary to define both "money" and "funds" and then equated an ordinary understanding of those terms with the dictionary definitions. *Petix* at 14, *Accord United States v. Budovsky*, No. 13CR368 DLC, 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015); *United States v. Murgio*, No. 15-CR-769 (AJN), 2016 WL 5107128 (S.D.N.Y. Sept.

19, 2016).  Perhaps there were circumstances in that line of Southern District cases that justified a first and exclusive resort to a dictionary. *Petix* at 14.  "Dictionary definitions of 'money,' however, are not helpful in determining congressional intent in employing that term in [a criminal statute]." *Petix* at 14, citing, *United States v. Jackson*, 759 F.2d 342, 344 (4th Cir. 1985).

As the Court noted above, there are several problems with a straight dictionary approach adhered to by the Government in its Opposition to this Motion.  First, a dictionary approach overlooks the numerous times in the United States Constitution and Code when the term "money" consistently has referred to some kind of instrument issued and regulated by a sovereign. *Petix* at 14.  Second, the approach does not address the Supreme Court's determination of the ordinary meaning of the term "funds." *Petix* at 14.  Third, as the Supreme Court noted in *Yates*, terms in ordinary life do not always line up with dictionary definitions, and ordinary people simply would not think of any private medium of exchange as money. *Petix* at 14.  Finally, resorting exclusively to a dictionary does not address the desire, implicit in Section 1960, to keep the United States monetary system away from criminal activity and transactions that support it. *Petix* at 14.  The weight of those authorities, experiences, and statutory objectives must be allowed to control here over broad technical definitions that lack context. *Petix* at 14.

As outlined in *Petix*, the Court reminded the parties that it is only interpreting the language of Section 1960 in its current form. *Petix* at 15.  The Court took no position on whether and how Congress should amend Section 1960 to define "money" and "funds" for purposes of that section. *Petix* at 15.  The Court also took no position on the deeper issue of whether block chain technology and virtual currencies should be fit into existing regulatory schemes, as opposed to devising new schemes to address a completely new technology. *Petix* at 15.  Given

the options available for future regulation, any discussion about regulating virtual currencies is best left to the political process. *Petix* at 15; *Compare, e.g.,* Carla L. Reyes, *Moving Beyond Bitcoin to an Endogenous Theory of Decentralized Ledger Technology Regulation: An Initial Proposal*, 61 Vill. L. Rev. 191, 228 (2016) (proposing an iterative "regulation-through-code" approach to block chain technology) *with* Petter Hurich, *The Virtual is Real: An Argument for Characterizing Bitcoins as Private Property*, 31 B.F.L.R. 573 (2016) (proposing that bitcoins be regulated as private property).  This Court should adhere to the same rational when determining the fate of Defendants in this case.

For all of the foregoing reasons, the Defendants respectfully move this Honorable Court to dismiss the Indictment in this case.

Dated at Portland, Maine this 10th day of May, 2017.


Respectfully submitted,

 /s/ Roger F. Brunelle Jr._____
Roger F. Brunelle Jr., Esq.
75 Pearl Street, 2nd Floor
Portland, ME 04101
207-699-4357
Roger@rbrunellelaw.com

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2017, I electronically filed Defendants' Reply Government's Opposition to the Defendants' Motion to Dismiss, with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Michael Conley, Assistant U. S. Attorney
U.S. Department of Justice
U.S. Attorney's Office
100 Middle Street,
East Tower, 6th Floor
Portland, ME 04104-5018
(Attorney for United States of America)

Dated at Portland, Maine this 10th day of May, 2017.

Respectfully submitted,

 /s/ Roger F. Brunelle Jr.
Roger F. Brunelle Jr., Esq.
75 Pearl St., 2nd Floor
Portland, ME 04101
207-699-4357
Roger@rbrunellelaw.com

7