UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:15-CR-198-GZS |
| | ) | |
| Sal Mansy, | ) | |
| TV Toys, LLC | ) | |

**DEFENDANT SAL MANSY'S MOTION FOR
DEPARTURE AND/OR VARIANT SENTENCE**

NOW COMES the Defendant, Sal Mansy, by and through his undersigned counsel, and moves that this Court to depart downward based upon the factors set forth in this motion, and/or sentence the Defendant below the guideline sentencing range, based on the factors set forth in Title 18 U.S.C. §3553(a), on the grounds that: (1) a sentence within the Guideline sentencing range would be contrary to the statutory mandate that the court impose a sentence sufficient but not greater than necessary, to comply with the purposes of sentencing[1]; (2) the nature and circumstances of the offense and the history and characteristics of the Defendant warrant a variant sentence.

*I.    Introduction*

The PSR suggests that Mr. Mansy might be eligible to receive departure and/or a variant sentence as a result of the following:

**PART E. FACTORS THAT MAY WARRANT DEPARTURE**

> PSR¶71. The inclusion of the following information is not necessarily indicative that the probation officer is recommending a departure from the applicable sentencing guideline range.

> PSR¶72. The Court may find that there are grounds for departure in this case pursuant to USSG §§2B1.1, comment. [n.20(C)] (if fraud guideline substantially over states the seriousness of the offense), 5K2.0 (combination of factors), 5K2.11 (lesser harms – conduct did not cause the harm sought to be prevented).

---

[1] See also *Rita v. United States*, 551 U.S. 338, 351 (2007); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

**PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM**

> PSR¶73. The inclusion of the following information is not necessarily indicative that the probation officer is recommending a variant sentence.
>
> PSR¶74. The defendant presents many issues in combination that may warrant a variant sentence. The defendant is age 43. He is the primary financial support for his family which includes a special needs child. He also helps care for his elderly father. It appears when the defendant started this venture he believed his actions were legal. The defendant became a naturalized U.S. Citizen after he fled a war-torn county as a child with his family.

## II. *"Fraud guideline substantially over states the seriousness of the offense" Departure: §§2B1.1, comment. [n.20(C)]*

Mr. Mansy should be entitled to a departure and/or a variant sentence in accordance with §2B1.1, comment. [n.20(C)]. The section states in relevant part:

> *(C) Downward Departure Consideration.—There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.*
>
> *For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted.*

There are a number of cases where courts have elected to depart because the offense level overstated the seriousness of the offense. For example, in *U.S. v. Broderson*, 67 F.3d 452 (2d Cir. 1995), in white collar contracts fraud case, the court granted a seven level departure because the defendant did not profit personally, contracts were favorable to government, and the "calculated loss significantly... overstated the seriousness of the defendant's conduct." In *U.S. v. Walters*, 87 F.3d 663 (5th Cir. 1996), in a money laundering case, a district court reasonably departed downward by six months where the defendant did not personally benefit from the fraud and the lack of benefit was not considered by the guidelines. In another example, *U.S. v.*

*McBride*, 362 F.3d 360 (6th Cir. 2004), in a bad check and bankruptcy scam, departure was warranted where intended loss of over $1 million "substantially overstated" actual loss of $800.[2]

As acknowledged by Probation, Mr. Mansy believed the activities surrounding his Bitcoin exchange were actually legal. In fact, any uncertainty Mr. Mansy experienced as he attempted to navigate the regulations surrounding Bitcoin exchange is understandable. The confusion is understandable, and the Defendants' position reasonable. Even a federal judge has ruled that Bitcoin was not currency and recommend that charges should have been dismissed against another Defendant charged with the same crime as Mr. Mansy.

A federal Court dismissed charges against the Defendant, who was charged with violating Section 1960 because they bought and sold Bitcoin. See *U.S. v. Richard Petix, U.S. District Court, Western District of New York, 15-Cr-227A;Report and Recommendation*.[3] A quote from the decision is most helpful in revealing why the Defendants may have been confused regarding registering:

> …Bitcoin is not "money" as people ordinarily understand that term. Bitcoin operates as a medium of exchange like cash but does not issue from or enjoy the protection of any sovereign; in fact, the whole point of Bitcoin is to escape any entanglement with sovereign governments. Bitcoins themselves are simply computer files generated through a ledger system that operates on block chain technology. *See, e.g.,* Shahla Hazratjee, *Bitcoin: The Trade of Digital Signatures*, 41 T. Marshall L. Rev. 55, 59 (2015) ("The Bitcoin system operates as a self-regulated online ledger of transactions. These

---

[2] See also, *U.S. v. Oligmueller*, 198 F.3d 669 (8th Cir. 1999) (departure upheld where actual loss of $829,000 from false loan application overstated risk to bank warranting use of loss figure of $58,000 and lower offense level where defendant had sufficient unpledged assets to support the loan amount and had paid the bank $836,000 of the amount owed when fraud discovered); *U.S. v. Jewell*, 2009 WL 1010877 (E.D.Ark.,2009) (30 month sentence imposed for aiding and abetting tax evasion where advisory guidelines range was 41 to 51 months, finding that a sentence so close to the statutory maximum of 5 years was not appropriate for a first-time offender such as defendant.); *U.S. v. Milne*, 384 F. Supp. 2d 1309 (E.D.Wis.,2005) (in bank fraud case where guidelines were 18 to 24 months, court imposed 6 months jail and 6 months home confinement for various reasons noting that "[w]ith their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability"); *U.S. v. Oakford Corp*, 79 F. Supp. 2d 357 (S.D.N.Y. 2000) (13 level departure granted where offense level overstates gravity of offense; each defendant personally realized "only small portion of the overall gain" of $15 million and agency tacitly encouraged floor brokers to "push the envelope").

[3] The *Report and Recommendation* was not adopted by the presiding judge because the Defendant entered into a plea agreement prior to the court final ruling.

transactions are currently denoted by the change of ownership in Coins. This ledger, also referred to as the 'block chain,' has certain built-in mechanisms that eradicate the risk of double spending or tampering with the master record of all transactions."). Like marbles, Beanie Babies™, or Pokémon™ trading cards, bitcoins have value exclusively to the extent that people at any given time choose privately to assign them value. No governmental mechanisms assist with valuation or price stabilization, which likely explains why Bitcoin value fluctuates much more than that of the typical government-backed fiat currency. *See, e.g.,* Jennifer R. Bagosy, *Controversial Currency: Accepting Bitcoin As Payment for Legal Fees*, Orange County Lawyer, June 2014, at 42 ("Bitcoin has other key features that make it very different from other methods of payment. First, the value of Bitcoin is highly volatile. In January 2013, one Bitcoin was worth about $13. By December 4, 2013, the price had skyrocketed to $1,061 per Bitcoin. By April 15, 2014, the value had dropped to $500 per Bitcoin.") (citation omitted). As for experiences in daily life, ordinary people do not receive salaries in bitcoins, cannot deposit them at their local banks, and cannot use them to pay bills. The Court cannot rule out the possibility that widespread, ordinary use of bitcoins as money could occur someday, but that simply is not the case now:

Bitcoin may have some attributes in common with what we commonly refer to as money, but differ in many important aspects. While Bitcoin can be exchanged for items of value, they are not a commonly used means of exchange. They are accepted by some but not by all merchants or service providers. The value of Bitcoin fluctuates wildly and has been estimated to be eighteen times greater than the U.S. dollar. Their high volatility is explained by scholars as due to their insufficient liquidity, the uncertainty of future value, and the lack of a stabilization mechanism. With such volatility they have a limited ability to act as a store of value, another important attribute of money. *State v. Espinoza*, No. F14-2923, slip op. at 5–6 (Fla. 11th Judicial Cir. Ct. July 22, 2016) (unpublished decision), http://www.miamiherald.com/news/local/crime/article91785802.ece/ BINARY/Read the ruling (.PDF) (last visited Dec. 1, 2016)…

The ordinary understanding of money, and Bitcoin's status outside of that understanding, bring the Court back to the case at hand. The Government's aphorisms aside (Dkt. No. 24 at 2), there might be ways to prosecute Petix if he had conspired with others to engage in activity that violated other criminal statutes. Here, though, and as noted above, the Government has chosen to focus on the transfer of bitcoins in itself. The Government's theory of prosecution requires treating Bitcoin as money in the ordinary understanding of that term. Because Bitcoin does not fit an ordinary understanding of the term "money," Petix cannot have violated Section 1960 in its current form. As a matter of law, then, Count Two fails no matter what amount of factual evidence the Government might have at its disposal.

There is no reason to believe that Sal Mansy and/or TV Toyz, LLC would not have been able to register as a currency broker, had they believed they were required to do so.  In addition, there is no reason to believe Mr. Mansy would not have registered as a currency broker had he

actually believed he was required to do so. Mr. Mansy and his company merely did not register because of a failure to interpret the law accurately regarding such registration. In fact, there is evidence that the Defendants relied upon an IRS opinion letter that declared that Bitcoin was property, not money. That IRS opinion letter is still valid, and has not been repealed.

It is well known that the exchange of Bitcoin received attention of the Government because Bitcoin was used to launder proceeds of criminal activities. Although it is conceded that TV Toyz, LLC, engaged in a healthy exchange of Bitcoin, no link to any criminal activity or organization was discovered by the Government through its extensive investigative efforts in this matter. *No evidence* has been found that shows Sal Mansy or TV Toyz, LLC, assisted with money laundering by exchanging Bitcoin.

There was no motive for the Defendants to conceal their activity, nor did Mr. Mansy or his company adhere to a strategy to conceal his Bitcoin exchange. Mr. Mansy declared the income derived from his Bitcoin exchange activities to the IRS. Certainly, Mr. Mansy would not have revealed the Bitcoin exchange to the IRS if he was engaged in any illegal activity, or was trying to conceal such.

Finally, essentially no actual loss was experienced in this matter, other than the failure by Mr. Mansy to pay the fee associated with registering as a currency broker. In addition, Mr. Mansy has already agreed to forfeit a substantial amount of money as a result his plea agreement. As indicated above, had Mr. Mansy registered as a currency broker, there is no reason he would not have been entitled to the proceeds he obtained through Bitcoin exchange. There is more than ample evidence justifying a departure or a variant sentence in this case.

III. *Mr. Mansy's family responsibilities warrant a departure and/or variant sentence.*

In relevant part, the Probation has stated the following about Mr. Mansy's personal and family information:

PSR¶43. Sal Mansy was born Salam Saeeb Ibrahim on July 4, 1974, in Basra, Iraq, to the marital union of Saeeb Mansy (age 86) and Nuhad Mansy (nee Kammo) (age 79). Mansy's father is a retired chef – Sbarro Pizza (in the United States) and sea port manager (Iraq), and his mother is a retired math teacher. Mansy's parents divorced approximately 7 years ago for reasons unknown to the defendant. As noted earlier in the report, Mansy's father is partially disabled due to age and the defendant helps care for him. He asserted he maintains a good relationship with both of his parents and they live in Michigan. Mansy has one brother, Wisam Ibrahim (age 39), who resides with the defendant's mother and who is mentally disabled (schizophrenia).

PSR¶44. Mansy reported that he was born in Iraq and lived with his parents and that he had a great childhood until war broke out. All of his needs were met and there were no unusual problems in the family home. When the Gulf war commenced, the defendant was approximately age 16 and the family left Iraq. They temporarily settled in Jordan for 10 months. They made it to the United States when the defendant was age 17, and they settled in Michigan. Mansy has been in Michigan since that time. The family reportedly lost everything financially because of the war.

PSR¶45. As verified by U.S. Immigration Services, Mansy became a naturalized U.S. Citizen on September 27, 2002, in Detroit, Michigan. Mansy asserted he legally changed his name in U.S. District Court for the Eastern District of Michigan when he became a naturalized U.S. Citizen. Immigration officials were not able to verify this information but confirmed that names changes at becoming U.S. Citizens are a common occurrence.

PSR¶46. The defendant is married. Mansy married Afrodit Mansy (nee Afrim) (age 37) on April 28, 2004, in Darok, Iraq. Mrs. Mansy is also a native of Iraq and was able to immigrate to the United States in 2005. This union produced one son, Joseph Mansy (age 9). Joseph resides with his parents and is enrolled in the 3rd grade at a local school and in the special needs program as he has Autism. Mansy stated that he and his wife sought fertility help in order to have their son. The defendant's wife is employed as a cashier/stock person at a local CVS pharmacy, earning $9.70 hourly.

Mr. Mansy will move this Court for departure and/or variant sentence because of his extraordinary family responsibilities. A motion for departure may be available pursuant to (§5H1.6). However, the threshold to obtain such a departure is extremely high. Accordingly, Mr. Mansy is also seeking a variant sentence based upon the same premise.

The Commission has opened a window for a small category of downward departures based on offender characteristics. The Commission placed as a condition on departure that the particular factor be "present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." In effect, the Commission has merely transformed a few "discouraged" factors requiring presence to an "exceptional" or "extraordinary" degree

for a departure, *see* USSG § 5K2.0(a)(4), into "encouraged" factors that must be present to "an unusual degree."

What the Commission means for a condition to be present "to an unusual degree" is not clear. One interpretation is that a condition is present "to an unusual degree" whenever it can be linked to a reduced risk of recidivism or is relevant to the defendant's culpability, vulnerability to abuse in prison, rehabilitative potential, or some other § 3553(a) consideration. Regardless, the current Amendments broaden the departure power of this Court. Pursuant to the Application Note of **§**5H1.6, a departure may be warranted if:

> *(B) Departures Based on Loss of Caretaking or Financial Support.—A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:*
>
>> *(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.*
>> *(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.*
>> *(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.*
>> *(iv) The departure effectively will address the loss of caretaking or financial support.*

First Circuit courts have affirmed departures for exceptional family circumstances only on rare occasions, noting that "time-consuming family responsibilities, by themselves, are not sufficient to take a case out of the 'heartland.'" *United States v. Roselli*, 366 F.3d 58, 68 (1st Cir. 2004); citing *United States v. Pereira,* 272 F.3d 76, 80 (1st Cir.2001). Nevertheless, courts have

upheld departures in limited circumstances where a defendant was so irreplaceable that incarceration would cause exceptional hardship to his family. *Roselli*, at 68.

In *United States v. Sclamo,* 997 F.2d 970, 974 (1st Cir.1993), the First Circuit Court of Appeals affirmed a departure where the defendant's stepson, who suffered from a psychiatric disorder and had a long history of aggressive and disruptive behavior, was making dramatic progress largely because of the support and care of the defendant. *Roselli*, at 68. In that circumstance, the defendant's important role could not practically have been filled by any other person. *Roselli*, at 68. In *United States v. Rivera,* 994 F.2d 942, 952-54 (1st Cir.1993), the First Circuit Court of Appeals ruled that the district court might justifiably depart on remand where defendant was the single mother of three young children, received income only from welfare, and had virtually no contact with or support from other family members. *Roselli*, at 68. This combination of factors might be enough, on a closer review of the facts, to render the defendant irreplaceable to her young children. See also *United States v. Haversat,* 22 F.3d 790, 797 (8th Cir.1994)(upholding departure because defendant's wife suffered from a severe psychiatric disorder and defendant was needed to "identify the beginning of any regression and to seek out immediate treatment to avoid 'a serious situation.'"). *Roselli*, at 68.[4]

---

[4] Section 5H1.6 motions, often involving some combination of a defendant's financial and non-financial obligations, including caretaking responsibilities and family members' medical needs, require courts to engage in fact-specific inquiries. See also, *United States v. Marinaro*, (D. Maine 2005). Compare *U.S. v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (sentence of 1 year and 1 day for a man who possessed with intent to distribute 100 grams of heroin, despite a guideline range of 46-57 months, based on his long work career, community support, lack of a criminal record, and responsibilities as sole supporter of 8-year-old son and elderly parents, which reduced the likelihood he would re-offend); *U.S. v. Dominguez*, 296 F.3d 192 (3d Cir.2002) (district court erred in concluding it could not depart four levels in bank fraud case for defendant who resided with elderly parents, who were physically and financially dependent on her); *U.S. v. Lehmann*, 513 F.3d 805 (8th Cir. Jan. 17, 2008) (sentence of probation affirmed where justified by the atypical nature and circumstances of the felon in possession case and by the defendant's need to care for her nine ear- old developmentally-disabled son); *U.S. v. Crawford*, 2007 WL 2436746 (E.D. Wis. Aug. 22, 2007) (District court granted a variance from the Guidelines due to the defendant's family situation with five children and the impact incarceration would have on the children).

A downward departure for extraordinary family circumstances may be appropriate where the care provided by the defendant is "irreplaceable or otherwise extraordinary." *Roselli*, at 69; citing *Pereira,* 272 F.3d at 82. This standard requires the district court to determine whether "there are *feasible* alternatives of care that are relatively comparable to what the defendant provides." *Roselli*, at 69; citing *Pereira,* 272 F.3d at 82 (emphasis added). Thus, a downward departure is appropriate if the defendant's role "is so different in kind or degree from the many kinds of support that can be important in the [family] relationship that it makes the family ties and responsibilities factor ... exceptional." *Roselli*, at 69; citing *United States v. Louis,* 300 F.3d 78, 82 (1st Cir.2002).

As indicated in ¶74, Mr. Mansy is the primary financial support for his family[5]. His wife works at CVS during the night shift and is paid a nominal salary. The loss of Mr. Mansy's income will cause tremendous financial strain on the family, at a time when every resource is needed. Without Mr. Mansy's income it is not likely the family will be able to keep the family home. In addition, Mr. Mansy and his wife share the caretaking responsibilities of their special needs child, and Mr. Mansy's elderly father. Without Mr. Mansy, it will be difficult, if not impossible, to sustain the care necessary for these individuals. The family does not have the financial means to pay for assistance from providers. Accordingly, this Court should depart from the guideline range in order to fashion a sentence that will allow Mr. Mansy to continue his essential duties to his family, and order a fully probated sentence, or a term of home confinement, as punishment in this matter.

### IV. "Lesser Harms" Departure: 5K2.11

Mr. Mansy will seek a departure and/or variant sentence in accordance with §5K2.11, based upon the same argument set forth above. The section states in relevant part:

---

[5] See attached letters from family and treating physician or Mr. Mansy's son.

> Sometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing. Where the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted. For example, providing defense secrets to a hostile power should receive no lesser punishment simply because the defendant believed that the government's policies were misdirected.
>
> In other instances, conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue. For example, where a war veteran possessed a machine gun or grenade as a trophy, or a school teacher possessed controlled substances for display in a drug education program, a reduced sentence might be warranted.

The Government and Mr. Mansy have jointly recommended to this Court that Mr. Mansy receive a departure and/or variant sentence based upon §5K2.11. As outlined above, and as addressed by the parties, Mr. Mansy should receive a fully probated sentence and/or home confinement that allows for Mr. Mansy to fulfill his family responsibilities.

As acknowledged by Probation, Mr. Mansy believed the activities surrounding his Bitcoin exchange were actually legal. There is no reason to believe that Sal Mansy and/or TV Toyz, LL would not have been able to register as a currency broker, had they believed they were required to do so. In addition, there is no reason to believe Mr. Mansy would not have registered as a currency broker had he actually believed he was required to do so. Mr. Mansy and his company merely did not register because of a failure to interpret the law accurately regarding such registration. In fact, there is evidence that the Defendants relied upon an IRS opinion letter that declared that Bitcoin was property, not money. That IRS opinion letter is still valid, and has not been repealed.

It is well known that the exchange of Bitcoin received attention of the Government because Bitcoin was used to launder proceeds of criminal activities. Although it is conceded that TV Toyz, LLC, engaged in a healthy exchange of Bitcoin, no link to any criminal activity or

organization was discovered by the Government through its extensive investigative efforts in this matter. *No evidence* has been found that shows Sal Mansy or TV Toyz, LLC, assisted with money laundering by exchanging Bitcoin.

There was no motive for the Defendants to conceal their activity, nor did Mr. Mansy or his company adhere to a strategy to conceal his Bitcoin exchange. Mr. Mansy declared the income derived from his Bitcoin exchange activities to the IRS. Certainly, Mr. Mansy would not have revealed the Bitcoin exchange to the IRS if he was engaged in any illegal activity, or was trying to conceal such.

Finally, essentially no actual loss was experienced in this matter, other than the failure by Mr. Mansy to pay the fee associated with registering as a currency broker. In addition, Mr. Mansy has already agreed to forfeit a substantial amount of money as a result his plea agreement. As indicated above, had Mr. Mansy registered as a currency broker, there is no reason he would not have been entitled to the proceeds he obtained through Bitcoin exchange. There is more than ample evidence justifying a departure or a variant sentence in accordance with §5K2.11.

### IV. *Nature and circumstances of the offense and history and characteristics of the defendant warrant a variant sentence.*

The Sentencing Reform Act has always provided that the "court, in determining the particular sentence to be imposed, shall consider-- the nature and circumstances of the offense *and the history and characteristics of the defendant*," 18 U.S.C. §3553(a)(1), and that "[n]o limitation shall be placed on the information concerning the *background, character*, and conduct of [the defendant which the court] may receive and consider for the purpose of imposing an appropriate sentence." 18U.S.C. §3661 (emphasis supplied).

### a. Low rate of recidivism for individuals over the age forty.

Mr. Mansy is a forty three years old. Defendants over the age of forty exhibit markedly lower rates of recidivism in comparison to younger defendants. See *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines,* at 12, 28 (2004). In addition, recidivism rates decline relatively consistently as age increases." *www.ussc.gov/publicat/ Recidivism_General.pdf.*

There are a number of cases that support this contention. In *U.S. v. Carter,* 538 F.3d 784 (7th Cir. 2008) the court issued a 24-month sentence for money laundering where GR was 87-108 months, based partly on conclusion that at age 61, defendant posed lower risk of recidivism. In *U.S. v. Thomas*, 595 F.Supp.2d 949 (E.D.Wis.,2009) considering defendant's age a district court imposed 5 months in custody and 5 months home detention with three years supervised release, where guidelines recommended 27-33 months imprisonment. In *U.S. v. Hodges*, 2009 WL 366231 (E.D. N.Y., Feb. 12, 2009) the court sentencing the defendant, relying, in part, on lower risk of recidivism for older defendants like the 43-year-old defendant. As noted by the court in *U.S. v. Lucania*, 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005) "Post-*Booker* courts have noted that recidivism is markedly lower for older defendants."[6] Based upon Mr. Mansy's age, his character, as well as the circumstances surrounding the underlying offense, it is unlikely Mr. Mansy will commit another offense again.

---

[6] See also, *U.S. v.Carmona-Rodriguez*, 2005 WL 840464, *4 (S.D.N.Y. April 11, 2005) (unpub.) ( where 55 year old woman pled guilty to drug distribution, 30-month sentence (below guideline range) was appropriate due to low probability defendant would recidivate); *Simon v. U.S.*, 361 F. Supp. 2d 35 (E.D.N.Y. 2005) ("Under the Guidelines, age was not normally relevant to sentencing. §5H1.1. Post-*Booker,* however, at least one Court noted recidivism drops substantially with age);*U.S. v. Nellum*, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005) (unpub.) (57-year old defendant convicted of distributing crack with guideline range of 168-210 months, court imposed 108 months based on need to deter under § 3553(a)(2) and low likelihood of recidivism upon release).

12

### b. *White collar crimes do not require significant jail sentences as punishment for effective deterrence.*

Under Section 3553(a), courts are *required* to sentence below the range if such a sentence would be sufficient to achieve the purposes of punishment. A study involving federal white-collar offenders in the pre-guideline era found no difference in deterrent effect even between probation and imprisonment.[7] That is, offenders given terms of probation were no more or less likely to reoffend than those given prison sentences.

As with other white collar offenders, a jail sentence is not necessary in order to achieve the necessary deterrent effect in this case. There are a number of cases where the courts have issued shorter sentences for white collar offenses. For example, in *U.S. v. Groos*, 2008 WL 5387852 (N.D.Ill., 2008) a court considered that lengthy incarceration for crimes involving shipping of embargoed goods were ineffective to the aid of deterrence which merited a non-guidelines sentence. The court imposed sixty days incarceration and one year supervised release with a fine, despite guidelines recommendation of 24 - 30 months.

In *U.S. v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) where guidelines called for life sentence for securities fraud, court imposed forty-two month sentence partly based on "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders" and government failed to present any evidence or empirical studies that sentence of more than 3 ½ years was necessary to achieve the retributive and deterrence objectives of §3553(a)).

Finally, in *U.S. v. Habib Munye*, 1:11-cr-00226-GZS, this Court issued a fully probated jail sentence to the Defendant. The defendant was charged in a fifty-five count indictment returned by a federal grand jury on December 14, 2011. Counts 1 through 39 alleged that

---

[7] *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J.

between April 3, 2009 and February 19, 2010 the defendant knowingly structured cash deposits into a bank account for the purpose of evading the currency transaction reporting requirements of 31 U.S.C. § 5313, in violation of 31 U.S.C. § 5324(c).  Counts 40 through 55 alleged that between April 3, 2009 and February 1, 2010 the defendant knowingly structured the purchase of money orders to evade the record keeping and reporting requirements of 31 U.S.C. § 5325(a), also in violation of 31 U.S.C. § 5324(c). The indictment further alleged that the enhanced sentencing provision of Section 5325(d)(2) applied in this case as the total value of the structure transactions exceeded $500,000. The defendant was found guilty after a trial on all counts.

Although that case did not involve Bitcoin, the criminal charges involved a similar type offenses; the failure of an individual to register or identity monetary transactions.  In determining the sentence in *Munye* the loss figures and guideline range were very similar to that calculated in this case.  In addition, unlike in this matter, the defendant in *Munye*, initially, did not take responsibility for his actions, and required the Government to endure a trial.   There is no discernable reason why Mr. Mansy should not be afforded a similar type sentence in this matter as well.  Especially since Mr. Mansy took responsibility for his actions and pleaded guilty to the underlying charges.

In this case a significant jail sentence is not required to act as a deterrent. Mr. Mansy should not receive a jail sentence in this case.  Certainly, society would be better served if Mr. Mansy is able to return to it, rather than serve time in jail.

   c. *"Overstated Criminal History" Departure: §4A1.3(b)(1)*

In this case U.S.S.G. §4A1.3(b)(1) should apply, and/or a variant sentence should be issued based upon the same principle.  Mr. Mansy received a two-level enhancement for allegedly engaging in the underlying misconduct while he was subjected to probation.  The evidence demonstrates that, at most, Mr. Mansy would have engaged in this misconduct for one

month during the probationary period.  In addition, as in indicated above, Mr. Mansy was confused about the registration requirements and did not purposefully violate such during the probationary period.

The Sentencing Guidelines authorize a sentencing court to depart downward from the applicable Sentencing Guideline range if "a defendant's criminal history category significantly over-represents the seriousness of [his] criminal history or the likelihood that [he] will commit further crimes." U.S.S.G. §4A1.3(b)(1); *See also U.S. v. Woodley*, 344 F.Supp.2d 274 (D. Mass. 2004).  Mr. Mansy should receive a sentence which more accurately reflects the seriousness of his criminal history and the likeliness that he may commit another offense.

## IV. *Conclusion*

Mr. Mansy's motion will assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 125 S. Ct. 738 (2005).  *Booker* restored the district courts' ability to fashion a sentence tailored to the individual circumstances of the case and defendant by requiring courts to consider factors other than the sentencing range prescribed by the United States Sentencing Guidelines.  Indeed, under Section 3553(a), courts are *required* to sentence below the range if such a sentence would be sufficient to achieve the purposes of punishment.

Mr. Mansy respectfully requests that the Court consider several important circumstances of this case in recommending an appropriate sentence.  The sentencing guideline range is no longer binding on the Court, but is only one of five factors to be considered in determining the sentence. *Booker*, 125 S. Ct. at 764-65.  In accordance with the ruling in *Booker*, a "court in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, the length of the term, shall consider the factors set forth in section 3553(a) to the

extent that they are applicable, recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation*." 18 U.S.C. § 3582(a) (emphasis supplied); 28 U.S.C. § 994(j); *See also U.S. v. Booker*, at 757, 764, 766, 767, 768.

Mr. Mansy should be sentenced to a term of probation, or perhaps home confinement. Conditions of such could be fashioned to allow for Mr. Mansy to continue his essential caretaking role, and allow for the Government to monitor Mansy's actions to ensure he complies with federal regulations while engaging in any future business endeavors.

Dated at Portland, Maine this 29th day of November, 2017.

/s/ Roger F. Brunelle Jr.
Roger F. Brunelle Jr., Esquire
Attorney for Defendants

LAW OFFICES OF ROGER F. BRUNELLE, JR.
75 Pearl St., 2nd Floor
Portland, ME 04101
(207) 699-4357
roger@rbrunellelaw.com

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2017, I electronically filed Defendant Sal Mansy's Motion for Departure and Variant Sentence with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

    Michael Conley, Assistant U. S. Attorney
    U.S. Department of Justice
    U.S. Attorney's Office
    100 Middle Street,
    East Tower, 6th Floor
    Portland, ME 04104-5018
    (Attorney for United States of America)

    Respectfully submitted,

    /s/ Roger F. Brunelle Jr.
    Roger F. Brunelle Jr., Esq.